## UNITED STATES v. REID.

### No. 10312.

District Court, W. D. Louisiana,
Shreveport Division.

March 10, 1943.

Malcolm E. Lafargue and Albert E. Bryson, both of Shreveport, La., for plaintiff.

Wellborn Jack, Frank J. Looney, and Ben F. Roberts, all of Shreveport, La., for defendant.

DAWKINS, District Judge.

On January 20, 1943, defendant was convicted of the charge of threatening the life of the President in violation of, 18 U.S.C.A. § 89. A motion for a new trial was filed January 23, which, in effect, alleged that the verdict was contrary to the law and the evidence in view of rulings made in the case. On February 18, another motion for new trial was filed upon grounds of newly discovered evidence. The latter recites that Cecil O. Flummer and Harris E. Reynolds, prisoners confined in the Alabama state penitentiary, would testify that Ben Head, one of the government witnesses at the trial, "shortly after the first trip that Head made to Louisiana", stated that he, Head, and the latter's wife were going to "frame" Reid and send him to the penitentiary. The motion alleged further that Fannie Lou Head, wife of Ben Head, also a vital witness for the prosecution, had sworn that she saw in Reid's possession a cloth or scarf bearing German swastikas; and since the trial this cloth had been found and is attached to the motion for a new trial. Also attached thereto are affidavits of Flummer and Reynolds, as well as one by Charles A. O'Neill, Jr., the latter stating that he had gone to the home of Reid in the city of New Orleans with the latter's wife and found the cloth or scarf; a letter addressed to one of the judges of this court dated January 24th, signed merely with initials, which enclosed another smaller sealed envelope, which the sender asked the judge to have "delivered to Mr. Reid or his trial attorneys". This was done. The last mentioned letter was addressed to "W. T. Reid" and reads as follows:

"This letter will no doubt be a surprise to you and your attorney. Not knowing your attorney's name I am taking the privilege of writing you. I believe the information I have will be useful to you. I am a prisoner confined at Kilby prison, Montg. Ala. I have been very close connected with "Ben Head", a witness, who recently appeared against you in Federal Court. Ben told me and one more man how he and his wife was going to (Frame) you. I could tell you a lot about Ben and your case, since I have found Ben to be such a dirty double crossing rat, I am willing to help you in any way I can. I am sure we hold information that will get you a new trial. This may seem funny to you but being prisoners we know what it is to be in prison, more so if you are innocent. We will give the information we have freely, and will not accept pay or reward. I believe it will be worth your while to have your attorney see us at once. Please remember we are in prison, this letter is smuggled out, this will have to be strictly personal. Wire me if you are interested and I will contact you again. I am sending this in care of your trial Judge not knowing your address. Hoping to hear from you at once.

"Cecil O. Flummer
"Kilby Prison, Montgomery, Ala."

It will be noted that the writer asks that Reid "wire me if interested and I will contact you again". It develops that a few days after Flummer wrote the letter he was placed in solitary confinement. In some way he managed to smuggle it out of the prison, apparently without the knowledge of the authorities. It is not easy to understand how he hoped to have a telegram addressed to him delivered without those in charge of the prison knowing it and then starting an investigation. In his affidavit, Flummer states that he is serving a sentence of 35 years for robbery; that "about a year ago Head proposed to sell affiant various kinds of dope and that affiant could resell it to other inmates of the prison and make big money"; that Head had suggested the renting of a post-office box under a fictitious name, through which the latter's wife could send the dope for delivery through a trusty; that affiant did not take Head up on the proposition but shortly thereafter began to deliver dope to affiant. Flummer gives the prices which he paid Head for the dope and paregoric and says that they continued to deal in it "until two or three days before Head went to Louisiana the first time as a witness in a case". Presumably, this meant when Head went before the grand jury. Affiant

then gives the details of what Head had said as follows:

"That shortly after the first trip that Head made to Louisiana, that he told affiant, that he, Head and Head's wife were going to frame a man in Louisiana by the name of W. T. Reid and 'send him up' for making threats to kill the President. That he, Head, and Head's wife were going to get even with Reid for something Reid had done.

"Affiant further says, that he does not know W. T. Reid nor any other person having a similar name.

"That no one has ever spoken to affiant in Reid's behalf until to-day, when he talked to a gentleman, who said, that he was Reid's attorney, and told him the statements made in this affidavit.

"That all he knows about Reid and the charges against him, he learned from Ben Head, while Head and affiant were fellow prisoners in the Alabama State Prison.

"That he has received nothing for giving this information, has been promised nothing and will accept nothing.

"That the only motive he has in making this affidavit is to prevent an injustice to an innocent man, he does not know."

After Reid's conviction, additional counsel were employed and one of them, after reading the letter from Flummer, obtained from this court a letter of introduction to the warden of the Alabama penitentiary, to be used in obtaining authority to interview the prisoner, who, as above stated, was then in solitary confinement. After the interview, Flummer gave the affidavit marked "A", attached to the motion, but declined to mention the name of the other prisoner, whom he said heard the statements of Head, until he should be released from solitary confinement and have an opportunity to talk to this prisoner. Flummer's affidavit is dated February 13th, and that of Reynolds February 16th following. The latter also says that he heard Head make the statement that "unless a man in Louisiana named Reid, came across with some money, that he, Head and Head's wife were going to frame him, and send him, Reid to the penitentiary".

It will be noted that in Flummer's affidavit there is nothing about obtaining any money from Reid but that the reason for the frame-up was that "Head and Head's wife were going to get even with Reid for something Reid had done".

As above stated, the last motion for a new trial was filed February 18th, and on the same date, the assistant District Attorney, who tried the case, obtained from Head and filed on the 19th a counteraffidavit, sworn to before the said assistant District Attorney as a notary public. That affidavit is as follows: "I know Cecil Flummer. He is doing a twenty-five or fifty year sentence in Kilby Prison, in Alabama, where I am also serving a term. He works in the cell block and dining-room where I do too. I have never had any conversation with Flummer as to the testimony in the Reid case. Of course, it was known that I was coming here to testify, but I did not discuss the details with anyone; and, particularly, I never did tell Flummer or anyone else that I had or intended to frame anybody, and don't now. This threat was made, as well as I remember, in May 1941. I did not mention it to anyone at all until last September when Mr. Ryan of the Secret Service came to see me and I gave him a statement".

Evidently Head was still in the Caddo Parish jail and had not been returned to the Alabama prison after the completion of Reid's trial of January 20th, and therefore had no opportunity to talk to Flummer about the trial. If so, then any conversation between Head and Flummer must have taken place between the returning of the indictment on December 8, 1942, after Head's appearance before the grand jury about that time, and his going to Shreveport for the trial, which began on January 18, 1943. Nevertheless, Flummer seems to have obtained rather complete information, for, four days after the conviction (January 20th) he (on January 24th), was found writing this letter. There is nothing to explain how he learned of the conviction so quickly, that a motion for a new trial would be sought and the name of the trial judge and his attorneys. As stated to counsel for the defendant at the oral argument, the circumstances surrounding the furnishing of this information are rather mysterious. It seems that if there had been a genuine desire to help someone unknown to him because of a belief that a "frame-up" was being perpetrated, Flummer would have done so before the trial or have called it to the attention of the prison authorities so that it could be conveyed to this court or the attorneys for Reid, instead of pursuing the course which was taken. Neither can I understand why he was unwilling to give the name of the other prisoner, Reyn-

olds, until he was released from solitary confinement. It could have been that he wanted that statement to conform to his own, or he might have thought Reynolds would have some objection. It is realized, of course, that there is no presumed standard of conduct by men with the very bad criminal record which Flummer has. Reynolds is also serving a term of ten years in the Alabama penitentiary. The former was 25 when he began his imprisonment in 1938 and Reynolds was 25 at the time of his affidavit. It is also possible that one in Flummer's position could be actuated by altruistic motives, as he claims, but nevertheless the circumstances have to be considered. His venom towards Head is exposed in the letter to Reid, when he says, "I could tell you a lot about Ben Head and your case, since I have found Ben to be such a dirty, double crossing rat * * * ". It is noted also that in his affidavit he seeks to discredit Head by attributing to the latter a proposal to rent a postoffice box under a fictitious name through which narcotics could be sent in by Head's wife for peddling in the Alabama prison. Why, if Head was able, as Flummer says he later did, to handle the matter without him, did the former want Flummer in the scheme to share the profits? It so happens that while Head was in Shreveport (having gone for the trial which began January 18th) that on January 30th Flummer was caught with paregoric, which caused him to be placed in solitary confinement. He evidently did not know, as it developed in the trial, that Head and his wife had had domestic trouble and were separated before Head went to the penitentiary. He also was not aware that neither Head nor his wife had reported to anyone in authority the threats which they said Reid had made, but that Mrs. Head had mentioned it to someone else who thought enough of it to report it to the F. B. I. agent in Shreveport, who called upon Mrs. Head within less than a month afterwards. Although the present offense was alleged to have been committed in May, 1941, Head was not interviewed by anyone in authority until September, 1942. This appears not only in his affidavit, but it was brought out in the trial. Then, as the court reminded counsel at the oral argument of this motion, Head, as shown by a portion of his testimony taken down, not only did not appear vindictive, but seemed reluctant to testify against Reid.

It is also contended that because several of the witnesses against Reid, including Head, had been confined or were still in prison, that none of their testimony can be given great weight. All of them except Head and his wife were sworn on collateral matters, such as that Reid had boasted that he was a good friend of former German Consul Von Spiegel, and otherwise insisted that Germany would win the war and that we would be subject to Hitler's rule. Head and Mrs. Head were the witnesses who testified to the actual threats. His testimony, of course, is attacked because of the fact that he had been convicted of selling unregistered securities in Alabama, while as a witness he stated it was for making such sales without a license. He had no prior record but counsel contends that this difference between what he said the offense was and what it actually amounted to, constitutes deliberate falsehood, which, in view of the fact that he has been convicted, makes him unworthy of belief. I am not so impressed. One not a lawyer can readily make this mistake, that is, if he had registered he would have received a license, whereas it was the registration of the securities which was required. Although his testimony was to be weighed in the light of the fact that he was a convict, at the same time it was not destroyed thereby and the jury had the benefit of this fact brought out in the trial when considering it.

As to Mrs. Head, it is contended that because she gave a check that was turned down, and it was later placed in the hands of an attorney, who threatened to prosecute her, with the result that the matter was straightened out and the check made good, her testimony is thus discredited. She gave a plausible explanation as to why the funds which she expected to meet the check were not in the bank on time but that the mattter was settled to the satisfaction of the holder. The jury also heard and considered these circumstances. Because of the seriousness of the case the court listened carefully to her testimony and was not impressed that she displayed any feeling towards Reid. Other than the circumstances mentioned, her character and reputation for truth are not assailed. Counsel also claim that Mrs. Head's testimony was greatly weakened because she swore that Reid had in his possession and displayed in her home, where he visited, the cloth or scarf above

mentioned with swastikas on it, whereas when it was obtained by Mr. Charles A. O'Niell, Jr., in company with Reid's wife a few days after the trial, it proved to have been a rodeo handkerchief with · a picture of a cowboy on a bucking pony with the words printed by his side "Ride "em Cowboy". It was argued that the character on the cloth, which she saw, was the reverse of a swastika, the hooks or arms pointing to the right instead of to the left. This is true if you look at it from the back but when turned so that the words just quoted can be read, the characters are of the swastika design, that is, the arms or angles are to the left. Many other characters appear, the meaning of which is not clear, but some of them suggest the cross which is borne by the fighting planes of Germany and also its Iron Cross. In any event, I do not think it tends to destroy the honesty of Mrs. Head in her statements and belief that it bore the swastika, which naturally impressed her, if she is telling the truth, as well as other witnesses, about Reid's statements and activities showing his sympathy with the present German government.

There were three other witnesses who testified to statements made by Reid, two of whom were in jail with him for some time, and another had a rather bad criminal record, who, when questioned about it, said that it included "everything except murder". However, as above stated, their evidence was on collateral issues affecting the intent and wilfulness with which the alleged threats were made and the jury had the full benefit of the circumstances in weighing their testimony.

The only purpose of the alleged newly discovered evidence is to impeach Ben Head. If there had been anything further to show the possibility of ill feeling by Head towards Reid, there might be some basis for the exercise of the court's discretion in the granting of a new trial. However, not only does Head in his affidavit given under the circumstances above set forth emphatically deny making such a statement, but his demeanor and manner of testifying seemed to indicate that he was reluctant rather than anxious to injure Reid.

█ I do not believe that the showing made justifies the court in setting aside the verdict.

█ Counsel for defendant have also urged and devoted a good part of their brief· to an attack upon the indictment on the ground that the statute was intended to apply only to threats written and sent through the mail. The Congressional Record is cited to show the discussion of the matter when it was being considered by the Lower House. The Act, February 14, 1917, Ch. 64, 39 Stat. 919, 18 U.S.C.A. § 89, was passed just before we entered the last World War and when the bill was up for final passage, before the House, it was discussed at some length on the floor, beginning at page 9377 and ending on page 9379 of the Congressional Record. A careful examination of this discussion, it would seem, not only does not support counsels' position, but, on the contrary, discloses that it was intended to cover all threats. It is true that Mr. Webb, who was handling the matter on the floor, referred to the fact that a postoffice appropriation bill which had died in committee at the ending of the preceding Congress attempted to deal with the subject matter, and that some discussion was indulged in about sending threatening letters to the President, but Mr. Webb stated with respect to the measure then before the House:

"This bill was drawn by the Department of Justice, and the committee went over it carefully and amended it, and struck out the punishment for threats, either orally or by mail, against the successors to the President, and made it apply to the President alone. I can say to my friend that for 25 years threatening letters have come in the White House mail, and something ought to be done in the way of protecting the Chief Executive of this great Republic, if possible, from this kind of annoyance."

"A bad man can make a public threat, and put somebody else up to committing a crime against the Chief Executive, and that is where the harm comes. The man who makes the threat is not himself very dangerous, but he is liable to put devilment in the mind of some poor fellow who does try to harm him."

Counsel also urge that the colloquy between Mr. Webb and Congressman Caraway supports this contention, wherein the latter called attention to the language:

" 'Or who knowingly and wilfully otherwise makes such threat against the President, shall, upon conviction, be fined not exceeding $1,000 or imprisonment not exceeding five years, or both.'

"Now, what jurisdiction would a Federal court acquire if some man living in Maryland should orally threaten to do violence

to the President? Where could you punish him in a Federal court? If he indulged in speech of a violent nature within the jurisdiction of a State court, the State court could punish him but no Federal court could reach him."

Mr. Webb answered that if you could punish an actual assault upon the President in a Federal court, which was already provided as to certain Federal officers, there was no reason why you should not punish a threat to make an assault.

While the exact point raised here does not appear to have been discussed in all the following cases, they all apparently involved only oral threats. United States v. Metzdorf, D.C.Mont.1918, 252 F. 933, 935; United States v. Stickrath, D.C.Ohio 1917, 242 F. 151; Clark v. United States, 5 Cir., 1918, 250 F. 449; United States v. Jasick, D.C.Mich.1918, 252 F. 931.

The Clark case was a decision by the Court of Appeals for this, the Fifth Circuit, in which the language used was quoted as having been orally made and in a few lines that Court affirmed the lower court's ruling that it was sufficient to constitute a crime and affirmed the conviction. In United States v. Stobo, 251 F. 689, the exact point was involved and decided adversely to defendant's contention by the District Court.

■■ In the course of the trial of the present case counsel for defendant objected strenuously several times to the court's permitting the prosecution to prove other statements and instances wherein the sympathy of the accused with the German cause was displayed. As stated then, it was thought that this was admissible to show intent or the state of defendant's mind as to the wilful and serious nature of the statement, as against idle talk or joking. The exact point was brought up by Mr. Raker in the discussion on the floor of the House who asked if the words "and wilfully" should not be stricken out; but after Mr. Volstead had called attention to the fact that if this were done, anyone sending a newspaper or writing containing such a threat to another with no idea of approving it but simply to call attention to it, would violate the provision against the use of the mails, it was decided to leave these words in to show that the threats must be wilful or intentionally made but not necessarily that the intention of carrying them out existed. See United States v. Stobo, supra. It was upon this point, as to whether it was necessary that the Government prove that the accused had the intention of carrying out his threats, as distinguished from wilful and intentional making of the statements, that this court charged the jury at length before it retired.

The decisions cited, as well as the discussion in the Lower House of Congress, above referred to, point out and stress the dangerous possibility of inciting others to commit such acts if the threats are made publicly and in the hearing of others.

The charge speaks for itself as to the care and caution that the jury should use in considering the case so as not to allow the fact that we are in war to induce a conviction, which would not be done if we were at peace. It would seem that the jury did give serious consideration to the case in view of the fact that they returned on two occasions to have a further clarification upon the point as to whether the accused should have had an intention to carry out the threats as distinguished from the wilful intent with which they were made.

It is my view that the attack upon the statute can not prevail and the motion should be overruled.