**Robert WATTS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 21528.**

United States Court of Appeals
District of Columbia Circuit.

Argued April 10, 1968.

Decided Sept. 25, 1968.

Mr. Joseph Forer, Washington, D. C., (appointed bý this court) for appellant.

Mr. Lee A. Freeman, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Victor W. Caputy, Asst. U. S. Attys., were on the brief for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and BURGER and WRIGHT, Circuit Judges.

BURGER, Circuit Judge:

This is an appeal from a conviction for threatening the life of the President of the United States in violation of 18 U.S. C. § 871(a) (1964).[1]

Appellant attended a DuBois Club meeting and participated in a discussion group dealing with police brutality. In the course of these discussions, Appellant allegedly made a statement that he would refuse induction into the armed forces and "if they ever make me carry a rifle the first person I want [or would want or would like to have] in my sights is LBJ."[2] There is evidence that he also stated that Negroes should not shoot their "black brothers" or Vietnamese. The following day he was arrested by Secret Service agents for threatening the life of the President. When arrested, Appellant was found to possess marijuana and an information was filed in the Court of General Session charging him with this misdemeanor.

---

1. 18 U.S.C. § 871(a) (1964) provides:
 (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. It is not disputed that this referred to President Johnson.

Prior to his trial for threatening the President, Appellant moved to dismiss the indictment on the ground that his words did not constitute a "threat" within the language of the statute. This motion was denied. Subsequently, in the marijuana prosecution, Appellant moved to suppress the evidence on the ground that the arrest and search were illegal since the arresting officers lacked probable cause to believe that a felony—threatening the life of the President—had been committed. The Court of General Sessions granted the motion. The government's request for reconsideration being denied, the government nolle prossed the marijuana charge.

The felony charge of threatening the President was tried in the District Court and Appellant was convicted.[3] Appellant raises three grounds for reversal (1) that the evidence was insufficient to support a finding that he uttered a "threat" against the President; (2) that a conviction would violate the First Amendment; and (3) that the prior judicial determination on the motion to suppress in the Court of General Sessions operated as collateral estoppel to the felony charge in the District Court.

### I.

■ Turning to the language of 18 U.S.C. § 871 (1964), we see that what it prohibits is "knowingly and willfully * * * mak[ing] any * * * threat to take the life of or to inflict bodily harm upon the President * * *." On its face, and under conventional standards of statutory construction, the statute prohibits the knowing and willful *act of threatening* the life of the President. The forbidden utterance is the criminal act; the adjective "willfully" precedes and modifies "threaten"; it has no relation whatever to the *act of killing or injuring*. The act of killing or assaulting is a separate crime. There-

fore, the District Judge correctly instructed the jury: "It is the making of the threat, not the intent to carry it out, that violates the law."

Given this clarity of the statute itself, there is little necessity to turn to the legislative history, except to discern the broad purposes of Congress. However, in light of the dissent's reliance on some utterances of an individual Congressman in terms that would actually alter the clear meaning of the statute, we turn to the total legislative history. The record of the House debates on section 871 does not, as the dissent asserts, "indicat[e] that Congress considered specific intent to execute the threat an element of the offense * * *." Indeed the House record is to the contrary.[4]

■ The ultimate purpose underlying section 871 is to deter the *act* of killing or injuring the President by deterring the *act* of theatening his life or safety. As Congressman Webb, the proponent of the bill, asserted: "That is one reason why we want this statute—in order to decrease *the possibility* of actual assault *by punishing threats* to commit an assault." 53 Cong.Rec. 9377–78 (1916) (emphasis added). The act of willfully threatening was itself made the crime not only to deter the threat but also the consequences of verbal or published threats in terms of their incitement of others—including those less stable than the speaker and perhaps more suggestible. Congressman Webb's explication of the rationale behind a prohibition of "threats" is of interest:

A bad man can make a public threat, and put somebody else up to committing a crime against the Chief Executive, and that is where the harm comes. The *man who makes the threat* is not himself very dangerous, but *he is liable to put devilment in the mind of*

---

3. The imposition of sentence was suspended and Appellant was placed on probation for four years.

4. Before seeking to discover Congressional intent relating to an unambiguous statute,

we would do well to remember Justice Frankfurter's incisive admonition that when the legislative history is unclear, judges should turn back to the language of the statute.

*some poor fellow who does try to harm him* [the President].

*Id.* at 9377 (emphasis added). Prophetically, Congressman Webb added: "I think the time may come when we will have great need for this kind of a statute." This review of the factors which prompted the promulgation of legislation prohibiting "threats" would seem to cast doubt upon the assertion of the dissent that "Congress considered specific intent to execute the threat an element of the offense." [5]

The dissent correctly quotes Congressman Webb's comment that "I think it must be a willful intent to do serious injury to the President." But we need to look at the context in which this statement was made. Some Representatives were troubled by the possibility that in the absence of the need for a "willful" threat, a man might be convicted for

mailing to a friend, as a matter of news, an article he had discovered which contained a threat by the author of the article on the life of the President.[6] A reading of the entire debate on section 871 reveals that Congressman Webb's comment about *"willful intent to do serious injury* to the President" is the only time that the concept of "willful intent" was joined with the act of killing or injuring. Without exception, every other reference to "willful intent" was in the context of a *"willful intent to threaten".* Reviewing the entire legislative debate on section 871, we conclude that, as is so often the case when various members address themselves extemporaneously to statutory language, these speeches are not without ambiguity; certainly the debate is far from indicating a Congressional desire to demand proof that the accused "made the statement with the specific intent to execute it" as

---

5. We see therefore that if the statute is directed at deterring the incitement of others to the prohibited action, to demand that the speaker "must willfully intend to do serious injury to the President" would defeat the effectiveness of the statute. We must ask ourselves whether Congress is impotent to prevent the reckless exhortations of a rabble-rouser who urges a mob to storm the White House but has absolutely no intention of his own to kill the President. *See* the dissent's evaluation that a conviction under § 871 cannot be sustained unless "the defendant made the statement with specific intent to execute it. * * *" With this thrust of the dissenting opinion, we profoundly and explicitly disagree.

Nor can we agree with the assertion that: "What *is* clear is that Congressman Webb, the *sponsor* of the bill, insisted upon a specific intent to execute the threat." Dissent at p. 687 n. 4. This analysis does not take sufficient cognizance of Congressman Webb's previously noted concern for the *incitement* dangers inherent in uncontrolled threats. See discussion *supra.*

6. The following colloquy ensued when some Congressmen were troubled by the possible conviction of a person who "intended" to make no threat.

MR. VOLSTEAD. Mr. Speaker, I think it would be a mistake to strike out the word "willfully." Suppose a person

found a document containing a threat and sent it through the mail to a friend as a matter of news. He might knowingly send the document, not intending to convey any threat. *The word "willfully" adds an intention to threaten,* and distinguishes a case of that kind so as to take it out of the category of criminal acts.

 * * * * *

MR. VOLSTEAD. No; I did not say that. If the gentleman will read it with the word "willfully" stricken out, he will see that a person might send innocently, without any intention to convey a threat at all, an instrument to a friend that contained a threat, and he would be guilty if you strike out the word "willfully."

 * * * * *

MR. VOLSTEAD. The gentleman does not catch the point I have in mind. This statute does not require that the instrument shall be sent to the President. It might be sent to some other person. *If, as the gentleman suggests, you strike out the word "willfully," a person who simply sends an instrument, say, a newspaper that contains such a threat to some friend to call his attention to the matter, would do so knowingly, and would come within the language of this bill.* 53 Cong.Rec. 9379 (1916) (emphasis added).

Judge Wright argues.[7] Indeed if the legislative history were to be so read, it would repeal the statute.

 Prior decisions construing section 871 similarly evidence the interpretation that it is the *threat* which must be "knowingly and willfully" made and not that the intent to execute the content of the threat be an element. To meet these requirements the government must establish that "the maker [of the threat] comprehends the meaning of the words uttered by him" and that "the maker voluntarily and intentionally utters them as the declaration of an apparent determination to carry them into execution." Ragansky v. United States, 253 F. 643, 645 (7th Cir. 1918). *See* Pierce v. United States, 365 F.2d 292, 294 (10th Cir. 1966). There is no requirement that the person uttering the threats have an intention to carry them out. *Cf.* Michaud v. United States, 350 F.2d 131 (10th Cir. 1965). Nor is it a defense that the words were intended merely as a jest. Pierce v. United States, *supra*; Ragansky v. United States, *supra*.

Appellant contends that the words he used could not be interpreted as a threat because they did not contain a statement of present intention to injure the President. Appellant asserts that his statement was a matter of common hyperbole rather than a true threat, that it expressed a desire rather than an intention to carry it out, and that it was conditional upon his being forced—by involuntary service—to carry a rifle whereas he had stated an intention to avoid induction into the Army.

 Appellant's conditional theory stems from the principle of the classic case of Tuberville v. Savage, 86 Eng. Rep. 684 (K.B. 1669), in which it was held that there was no assault where the defendant, at assize time, placed his hand on his sword and stated: "If it were not assize-time, I would not take such language from you." If an utterance is conditioned on factors which cannot be fulfilled, the condition negates any threat. Such a condition removes the apparent intent which is a necessary element. But the fact that the threat is conditional does not *per se* prevent it from being a violation of 18 U.S.C. § 871 (1964). Convictions have been affirmed [8] and indictments sustained [9] where the language was conditional. The "condition" of Appellant's submitting to induction into the Army does not negate the presence of apparent present intent since it is a matter within his control.[10] Statements with conditions such as "if I had the opportunity" or "if I had the power" or "if I ever get close enough to

7. In fact, Congressman Raker felt that sending or conveying a known threat should be enough to allow conviction. It was to prevent conviction in these circumstances of one who did not "*intend to threaten*" that the word willfully was retained in the statute. *See* note 6 *supra*.

8. Rothering v. United States, 384 F.2d 385 (10th Cir. 1967) ("appellant said that he wanted to go to jail; that he would do the same thing [rob] over again; that he would rob other people; and that 'if they didn't do any good "I will kill the President if it is necessary." ' "); United States v. Stepp, 144 F.Supp. 826 (D.Colo.1956) ("President Eisenhower is a German [————], and if I ever get close enough to him I will kill him. I have a 30-30 bullet for him. If he walks across the street in front of me I would let him

have it."); Clark v. United States, 250 F. 449 (5th Cir. 1918) ("I wish Wilson was in hell, and if I had the power I would put him there.")

9. United States v. Stickrath, 242 F. 151 (S.D.Ohio 1917) ("President Wilson ought to be killed. It is a wonder some one has not done it already. If I had an opportunity, I would do it myself.")

10. That the threat is conditioned upon a contingency subject to the maker's control does not deprive it of the quality of a threat, if the contingency be a possible one. Every threat unexecuted involves some contingency, if none other than that the maker's purpose be not abandoned, or that execution by him be not prevented.
United States v. Metzdorf, 252 F. 933, 938 (D.Mont.1918).

him," have been held violations of the statute. *See* notes 8 & 9 *supra.*

Appellant also claims that, when he stated he "would want" or "would like to have" or "wanted" to have "LBJ" in his rifle sights, he was merely expressing a desire, and not a threat. Other convictions under this statute have been affirmed where the statement was essentially in the form, as Appellant urges his statements were, of mere expressions of desires or wishes.[11] Appellant relies, however, on two cases in which there was found to be no statement of apparent intention to inflict harm. In United States v. Daulong, 60 F.Supp. 235 (W.D. La.1945), the indictment was quashed because it charged that the accused only stated he "had a notion" to kill the President and that, if no one else did it, he "felt like" killing him. The court found these words to lack any "expression of determination or intent to do the act itself." In United States v. Marino, 148 F.Supp. 75 (N.D.Ill.1957), an indictment was dismissed which charged that the accused had posted signs reading: "There can be slain no sacrifice to God more acceptable than an unjust President." Here again, the court found no expression of intent to perform the act in question.

Unlike these cases, Appellant's words, considered in context, reasonably permit an inference that he was uttering a threat. The naked words do not always tell the whole story. For example, the words "I will see you in the street at sundown" meant, in certain times and places, a challenge to a shooting. The context was all important—on Beacon Hill in Boston, the same words at the same period might have had a totally different meaning or none at all. It is the *message* the words communicate that

is at issue, and what that message meant was a question of fact for the jury under appropriate instructions. On this appeal, there is no challenge to the instructions.

Appellant's counsel urged the jury, as he does on appeal, that Appellant was expressing a mere *desire* and that his statements were gratuitous hyperbole. The District Judge charged the jury in accordance with the case law developed under the statute, including the definition of threat. He also instructed the jury that "a declaration of a mere desire to injure is not a threat" and that they were to consider the context and circumstances in which the alleged statement was made.

■ Among the circumstances that the jury could have considered in determining the import of the words here used was the testimony that in speaking Appellant made a gesture as if sighting down the barrel of a rifle. Appellant points out that his remarks were greeted by laughter and applause, and argues that this negates any acceptance by the listeners as a genuine threat. But it has not been unknown for laughter and applause to have sinister implications for the safety of others. History records that applause and laughter frequently greeted Hitler's predictions of the future of the German Jews. Even earlier, the Roman holidays celebrated in the Colosseum often were punctuated by cheers and laughter when the Emporer gestured "thumbs down" on a fallen gladiator. However, since Appellant did not claim at trial that his words were uttered in jest, we need not reach or decide what instructions would have been appropriate had he made such a claim except to observe in passing that subjective intent of the speaker, standing alone, has not

---

11. Ragansky v. United States, 253 F. 643 (7th Cir. 1918) ("We ought to make the biggest bomb in the world and take it down to the White House and put it on the dome and blow up President Wilson and all the rest of the crooks."); Clark v. United States, 250 F. 449 (5th Cir. 1918) ("I wish Wilson was in hell, and if I had the power I would put him there."); *cf.* United States v. Stobo, 251 F. 689 (D.Del.1918) ("The President ought to be shot and I would like to be the one to do it.") (Demurrer to indictment sustained for failure to aver that the oral threat was heard by anyone.)

been considered dispositive.[12] We need not decide what the situation would be if one accused under this statute claimed that he was acting in jest and showed that his listeners considered the utterance to be such. Here the Appellant laid no evidentiary basis for an instruction that his statements were uttered in jest and accepted as such by those who heard him. On the evidence and contentions developed at trial, a jury could reasonably have concluded either that the words were or that they were not a threat and either conclusion is within the range of a permissible verdict.[13]

## II.

Appellant's second contention is that his utterances are protected by the First Amendment and cannot be made the basis of a criminal prosecution. He argues that they are not words that by their very utterance tend to inflict injury or incite an immediate breach of the peace, Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and that they did not constitute a clear and present danger of a substantive evil which Congress has the power to prevent. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950). *See also* Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).[14]

 Meeting these claims directly, we conclude that the First Amendment does not prevent proscription of utterances that comprise knowing and willful threats to the life or safety of the President. Although freedom of speech is indeed one of "our most precious free-doms," Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967), and needs "breathing space to survive," id. at 604, 87 S.Ct. 675,

> [a]n analysis of the leading cases in [the Supreme Court] which have involved *direct limitations on speech* * * * will demonstrate that * * * this is not an unlimited, unqualified right, but that the societal value of speech must, on occasion, be subordinated to other values and considerations.

Dennis v. United States, 341 U.S. 494, 503, 71 S.Ct. 857, 864, 95 L.Ed. 1137 (1951). Simply because first amendment rights are in the "balance," Congress is not precluded from regulating particular individual activity. Before a decision on constitutionality is reached, "there must be weighed the value to the public of the ends which the regulation may achieve." Communist Party v. SACB, 367 U.S. 1, 91, 81 S.Ct. 1357, 1407, 6 L.Ed.2d 625 (1961). *See also* Dennis, *supra*; American Communications Association, C. I. O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

The basis for section 871 is clear. The Congress arrived at a legislative determination that the safety and freedom of movement of the Chief Executive was of such overriding importance to the well-being of the entire nation that threats which would tend to restrict his capacity to fulfill his duties or incite others to harm his person would not be tolerated. Congressional awareness of past Presidential assassinations in part contributed to the enactment of the 1917

---

12. Pierce v. United States, 365 F.2d 292 (10th Cir. 1966); Ragansky v. United States, 253 F. 643 (7th Cir. 1918); cf. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

13. See cases cited in notes 7–10, *supra*.

14. Contrary to what Appellant claims, he was not prosecuted for his expression of views on Negroes and the Vietnamese war. He was free to challenge and attack the policies of the United States and actions of the President. *See* Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). Appellant was prosecuted for uttering a threat against the life of the President under a statute narrowly drawn to prevent such utterances.

statute.[15] Recent experience with the assassination of three public figures in less than 5 years hardly undermines the conclusion reached by the Congress 50 years ago when it enacted Section 871.

A statute making it a criminal act to utter threats as to citizens generally might well be open to constitutional challenge. Assuming arguendo that a statute might not be sustained if applied to any threat toward any one of 200 million Americans, the statute here in question must be judged by different standards, limited as it is to the Chief Magistrate of the nation and his constitutional successors. Threatening language which might be thought tolerable when directed at a private citizen takes on a different hue when directed at the President and the dimensions of the consequences are an important guide.[16]

There are unique considerations surrounding the President of the United States. No person in the world, perhaps, is so comprehensively guarded. Yet this intensive protection has not prevented the assassination of four Presidents. In our system, the safety of the Chief Magistrate of the nation is so crucial to the national welfare that, notwithstanding our traditional tolerance of uninhibited and even vicious criticism of a President,[17] it was thought essential to make threats upon the life and safety of the President criminal acts. To appreciate the need to protect a President from danger or the inhibiting effect of threats, one only need recall the shock waves which rocked the entire world in November 1963 when a President was murdered. The enormous political, sociological, and economic consequences of that event are poignant reminders of the evil sought to be avoided by section 871. The assassination, or even attempted assassination, or suspicion of a conspiracy to this end, of no living person can upset the nation's—even the world's—equilibrium as does such action directed at a President of the United States.

When the interests to be protected are evaluated in the light of first amendment safeguards, the consequences here sought to be prevented afford a valid basis for reasonable limitation on speech.[18] The

15. Congressman Webb made this observation:

> [E]veryone admits that the Chief Executive of a great nation like ours ought to be protected in every way possible, especially in view of the sad experience we have had in losing by assassination three of our beloved Presidents.
>
> * * * * *
>
> [A]n ounce of prevention is worth a pound of cure, and we want to prevent the threats which often incite men to kill and murder.

53 Cong.Rec. 9378 (1916).

16. This distinction was clearly recognized by the drafters of section 871:

> It is a crime to assault any person, but it is not a crime to assault the President any more than any other person. It is a crime against the person, but it ought to be a very different offense. Assaulting the President of the United States is quite a different matter from assaulting some private individual. That is the reason the gentleman's bill has the provision against threats. There is a law now

covering the private individual, as far as these things are concerned, and the President to the same extent; but in this bill you are differentiating the office of President, and the man who fills the office, from any other citizen of the United States.

53 Cong.Rec. 9377 (1916).

17. Few would claim that much of the editorial commentary that has been aimed at our Presidents fails to fulfill the sought for "uninhibited, robust, and wide-open" debate necessary to a democratic society. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Moreover, prohibiting the very limited "criticism" of threatening the life of the President seems to be a trivial limitation on the overall capacity to present effective political argument. Can it be thought that "robust debate" is inhibited by prohibiting threats on the very life of a President?

18. Without entering the fashionable semantic debate, see dissent, pp. 690, 691 n. 11, on the vitality of "clear and present danger," "balancing of interests," or other

impediments which this statutory "regulation causes to entire freedom of individual action" are indeed outweighed by "the value to the public of the ends which the regulation may achieve." Communist Party v. SACB, *supra*, 367 U.S. at 91, 81 S.Ct. 1407. The protection of the President is precisely the type of substantial public interest which can justify prohibitions aimed at preventing substantive evils which can flow from the condemned activity. Cf. NAACP v. Button, 371 U.S. 415, 444, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

Although speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger," Terminello v. City of Chicago, 337 U.S. 1, 5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1919), a threat on the life of the President is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* Trivial hazards must of course be tolerated if they fall within the purview of the First Amendment,[19] but the turmoil attendant upon the death or disability of a President is hardly a "trivial hazard." When the gravity of this evil is discounted by the not so improbable likelihood of its occurrence, we conclude that it "justifies such invasion of free speech as is necessary to avoid the danger." Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137 (1951).

Given the sound basis for section 871's prohibition of threats on the President's life, we feel that the jury, having acted under instructions not challenged here, was warranted in finding that Appellant had or had not "knowingly and willfully" threatened the life of the President. Here, the import of Appellant's words were indeed susceptible of an interpretation by the jury that Appellant had made such a threat.[20]

This statute does not require the jury to undertake the almost impossible task of evaluating Appellant's subjective mental processes in relation to executing his apparent intent as that intent was manifested by his words and gestures in context.

## III.

■ Appellant also argues that the finding of the jury that his words constituted a threat under 18 U.S.C. § 871 (1964), cannot stand because of the collateral estoppel effect of a prior judicial determination. His claim is based upon the suppression by a Court of General Sessions Judge of the marijuana found on Appellant at the time of his arrest. The Judge found that there had been no probable cause for the Secret Service agents to believe that Appellant's words constituted a threat to the President. It is settled that a defendant in a criminal case can assert collateral estoppel against the Government in the proper circumstances.[21] Collateral estoppel will

---

labeled "tests" for determining First Amendment controversies, we conclude that the present regulation is valid within the strictures of any of these criteria.

19. Whitney v. People of State of California, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring): "Prohibition of free speech and assembly is a measure so stringent that it would be inappropriate as the means for averting a relatively trivial harm to society."

20. That these utterances were made at a meeting focusing on dissatisfaction with police-community relations and po-

lice brutality, and were made within a few hundred yards of the White House, are not irrelevant factors; they could have weighed in the jury's evaluation. Violence of extraordinary dimensions only recently was triggered in part by verbal incitement—again within a few hundred yards of the White House.

21. Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916); Laughlin v. United States, 120 U.S.App. D.C. 93, 344 F.2d 187 (1965); United States v. Kramer, 289 F.2d 909 (2d Cir. 1961).

prevent the relitigation of an issue that was necessary to a prior judgment or final disposition of a case.[22]

Appellant's claim does not take into account that there was a determination by a District Court Judge in the present case, prior to the action of the Court of General Sessions Judge, that the indictment charged statements sufficient to sustain a conviction under the statute. A General Sessions Judge acting on a minor charge cannot reverse a holding of the United States District Court—relating to the same issue. Appellant argues that the District Court order decided only that the words *could* support a conviction, depending upon the surrounding circumstances, whereas the General Sessions Judge made a factual determination considering those surrounding circumstances. The record, however, fails to support Appellant's characterization of the decision of the General Sessions Judge.[23] He heard only the testimony of one witness who related, not the circumstances surrounding the statements by Appellant, but the events surrounding the subsequent arrest and the words that the witness had been told were spoken by Appellant. His decision, just as that of the District Judge, was concerned only with the legal issue of whether the words spoken were sufficient under the statute.

■ A further difficulty with the claim of collateral estoppel here is that no authority holds that rulings on unappealable pre-trial motions matters are proper subjects for collateral estoppel. The only cases located were contrary to Appellant's position.[24] For example, in People v. Kissane, 347 Ill. 385, 179 N.E. 850 (1932), a defendant charged in a county court with the unauthorized possession of a pistol sought collateral estoppel from a municipal court's suppression of the pistol in a prior case on the same charge. The Illinois Supreme Court held that the doctrine was not available because the decision was a "mere prelim-

---

22. The Government argues that the suppression order was not a final order because it was not appealable. DiBella v. United States, 369 U.S. 121, 130–131, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962). But appealability is not the touchstone of a final order for these purposes. The most frequent type of order that leads to a claim of res judicata or collateral estoppel is a judgment of acquittal, *see*, *e. g.*, cases cited in note 21, *supra*, and that is not subject to appeal by the Government. However, judgments of acquittal and even dismissals of cases have a degree of finality that is absent when, as here, the prior case is terminated by the Government's nolle prosequi.

23. In assessing what issues have been determined for the purposes of collateral estoppel, it is appropriate to examine the record to see what was raised before the judge in question. Sealfon v. United States, 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

24. Tell v. Wolke, 21 Wis.2d 613, 124 N.W. 2d 655 (1963) (prior discharge after preliminary hearing is not res judicata as to subsequent prosecution on same charge); People v. Van Eyk, 56 Cal.2d 471, 15 Cal.Rptr. 150, 364 P.2d 326 (1961) (order in prior case setting aside information because of illegal seizure of evidence not res judicata in subsequent prosecution for related offense); People v. Prewitt, 52 Cal.2d 330, 340, 341 P.2d 1, 6 (1959) (prior dismissal of same charge on preliminary hearing because it was determined that the evidence was illegally seized was not res judicata or collateral estoppel on same issue in subsequent prosecution). *See* Vestal & Coughenour, *Preclusion/Res Judicata Variables: Criminal Prosecutions*, 19 Vand.L.Rev. 683, 692 (1966).

One reason for not according collateral estoppel consequences to rulings on pretrial motions of this nature is that frequently such action does not reflect full and careful determination of the issue. In the present case, for instance, the General Sessions Judge granted the Assistant United States Attorney only a short recess to locate the Assistant United States Attorney who had already convinced the District Court that the words were sufficient to constitute a violation of 18 U.S.C. § 871(a) (1964). When that Assistant could not be located at once, the General Sessions Judge gave short shrift to the prosecutor's argument that the same issue had already been determined by the District Court and was not open to the Court of General Sessions.

inary motion" and there had not been a trial, or even the entry of a plea by the defendant, in the prior case.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting).

Appellant attended a rally of the W. E. B. DuBois Club at the Sylvan Theater on the Washington Monument grounds. Those attending the rally divided into several discussion groups, one of which appellant joined. The rally and the discussion groups were open to the public.

In the course of a discussion of police-community relations in appellant's group, a participant said something to the effect that "we should have a better education before we get involved in things of this nature." According to Freeburger, an investigator for the Army Counter Intelligence Corps who was observing the discussion, appellant then replied:

"They always holler at us to get an education and yet I have already received my draft classification as 1–A and I have got to report this Monday coming for my physical. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers."

Shoemaker, a detective sergeant of the United States Park Police, essentially confirmed this version of what appellant said. According to Wieghart, a reporter for the Milwaukee Sentinel, appellant said in substance:

" * * * that he did not think that Negroes ought to serve in Vietnam to shoot Vietnamese. He didn't think black men should look down the barrel of a rifle to kill Vietnamese. He said that rather than looking down the bar-

rel of a rifle to kill Vietnamese people he would rather look down a rifle aimed at the President."

After appellant made his remark, persons in the audience laughed and applauded.

On the basis of these facts, appellant was convicted of "knowingly and willfully" making a "threat to take the life of or inflict bodily injury upon the President of the United States," under 18 U.S.C. § 871 (1964). I believe that the conviction cannot stand, when Section 871 is construed in accordance with its legislative history and the dictates of the First Amendment.

I

The statute today codified as 18 U.S.C. § 871 was enacted in what for purposes of this case can be regarded as its present form in 1917.[1] The brief report of the House Judiciary Committee, which approved the bill, stated its purpose as follows:

"This bill is designed to restrain and punish those who would threaten to take the life of, or inflict bodily harm upon, the President of this Republic. It is the first and highest duty of a Government to protect its governmental agencies, in the performance of their public services, from threats of violence which would tend to coerce them or restrain them in the performance of their duties." [2]

The House floor debate on the bill somewhat clarified and expanded upon this cryptic expression of legislative intent. In responding to the complaint that the bill was useless as a protection of the President's person, its chief spokesman, Congressman Webb, indicated that it was partly designed to prevent the incitement of others to assassination.[3] More significantly, Congressman Webb repudiated a suggestion that the

1. The Act was amended in 1955 to include threats against the Vice President and the President-elect, 69 STAT. 80, and in 1962 to include threats against the Vice President-elect and the person next in line to succeed the President when there is no Vice President, 76 STAT. 956.

2. H.R.REP.No. 652, 64th Cong., 1st Sess. (1916).

3. 53 CONG.REC. 9377 (1916).

words "and willfully" be deleted from the bill. In so doing, he indicated his view, as representative of the committee which had recommended the bill, of the intent required as an element of the offense which it created:

> "* * * I think he ought to be shown to have done it willfully. *I think it must be a willful intent to do serious injury to the President.* If you make it a mere technical offense, you do not give him much of a chance when he comes to answer before a court and jury. I do not think we ought to be too anxious to convict a man who does a thing thoughtlessly. *I think it ought to be a willful expression of an intent to carry out a threat against the Executive,* and I hope that the gentleman will not offer his amendment."

53 CONG.REC. 9378 (1916). (Emphasis added.) The requirement of willfulness was retained and the bill was enacted into law *without further substantive debate in either house.*[4]

This indication that Congress considered specific intent to execute the threat an element of the offense was largely ignored by the courts which first construed the act during 1917–18. Thus in United States v. Stickrath, S.D.Ohio, 242 F. 151 (1917), no intent to execute the threat was required to be alleged or shown. *See also* United States v. Stobo, D.Del., 251 F. 689, 693 (1918).

Ragansky v. United States, 7 Cir., 253 F. 643 (1918), gives an often cited definition of the intent element of the offense. The court upheld the conviction of a defendant alleged to have said, among other things, "I can make bombs and I will make bombs and blow up the President." The trial court had charged the jury that "'the claim that the language was used as a joke, in fun' is not a defense." *Id.* at 644. In supporting this charge over defendant's objection that it ignored the word "willfully" in the statute, the appellate court said:

> "And a threat is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and intentionally utters them as the declaration of an *apparent* determination to carry them into execution."

*Id.* at 645. (Emphasis added.) And, remarkably, the court went on:

> "While under some circumstances, the word 'willfully' in penal statutes means not merely voluntarily, but with a bad purpose [citations omitted], nothing in the text, context, *or history* of this legislation indicates the materiality of the hidden intent or purpose of one who * * * voluntarily uses language known by him to be in form such a threat * * *."

*Ibid.* (Emphasis added.)

In only one early case did the court cleave to the requirement of a specific intent to execute the threat. In United States v. Metzdorf, D.Mont., 252 F. 933, 938 (1918), a District Court dismissed an indictment under the act on the ground, among others, that it had alleged the supposedly threatening words alone, without including the innuendo that they were accompanied by a "present determination or intent to injure presently or in the future."

Among the few reported decisions between 1918 and 1965 which construe this

---

4. A statute punishing a "threat" made "knowingly and willfully" is hardly so unambiguous as to preclude looking to the legislative history for clarification of the mental element required. I do not claim that the House debate unambiguously supports the construction urged here. Congressman Volstead's remarks, for instance, can be read to have the import which the majority gives them. They can as well be read to express concern with only one among many dangers which deletion of the word "willfully" would bring on. What *is* clear is that Congressman Webb, the sponsor of the bill, insisted upon a specific intent to execute the threat. Because of the obvious dangers posed by the statute, and amply illustrated by the history of its use, I consider the narrower view of the mental element the proper one.

statute, none explicitly deal with the actual intent which must be shown to support a conviction for willfully threatening the President.[5] In two cases, courts dismissed indictments because the words defendants were alleged to have used could not have constituted threats; they did not even express *apparent* intent. United States v. Marino, N.D.Ill., 148 F.Supp. 75 (1957); United States v. Daulong, W.D.La., 60 F.Supp. 235 (1945).[6] Neither case reached the question of what, beyond the objective purport of the words, would have to be shown at trial to support a conviction under Section 871.

Since 1965, three decisions construing Section 871 are reported, all in the Tenth Circuit, which indicate that that Circuit has rejected the requirement of intent to execute the threats as an element of the offense. In Michaud v. United States, 10 Cir., 350 F.2d 131 (1965), the defendant telephoned a clear and explicit threat against the President's life to the White House. At trial, the court instructed the jury that, at least in the case of threats not inciting others to injure the President, "there must be proof beyond a reasonable doubt that the maker of such threats intended to carry them out himself." On appeal, the Tenth Circuit identified this charge with *Metzdorf*, which it characterized as a minority view, and remanded for a new trial under the *Ragansky* standard, according to which specific intent is not at issue.

The *Ragansky* rule was extended by the same Circuit in Pierce v. United States, 10 Cir., 365 F.2d 292 (1966), apparently to include obvious jokes, and in Rothering v. United States, 10 Cir., 384 F.2d 385 (1967), to include hyperbole. In *Pierce*, the defendant, an inmate in the city jail of Holton, Kansas, passed to a guard with orders that it be sent to the White House a piece of paper on which he had written in pencil, "I * * * swear to kill the President of the United States of America the first chance I get." To this oath he had appended the ominous postscript, "and by the way send me $100.00 for cigarette money." Tried under Section 871, he defended on the ground that his scrawled "threat" arose out of a joke with a drunken cellmate. The trial court charged, on the basis of *Ragansky*, that the claim that the "threat" was a joke is no defense. The Tenth Circuit affirmed, under the rubric, used by the District Court in its charge in this case, that "[i]t is the making of the threat, not the intent to carry it out, that violates the statute." 365 F.2d at 294.

*Rothering* affirmed the Section 871 conviction of a defendant who, after being arrested for breaking into a food market, told a policeman "that he wanted to go to jail; that he would do the same thing over again; that he would rob other people; and that 'if that didn't do any good "I will kill the President if it is necessary." ' " Against the defense that this statement was exaggeration or hyperbole, the court held that, just as

---

5. The cases I have located are Pierre v. United States, 8 Cir., 275 F. 352 (1921) (indictment dismissed because no allegation that anyone heard threat); United States v. Stepp, D.Colo., 144 F.Supp. 826 (1956) (indictment sustained); United States v. Reid, W.D.La., 49 F.Supp. 313, *affirmed*, 5 Cir., 136 F.2d 476, *cert. denied*, 320 U.S. 775, 64 S.Ct. 87, 88 L.Ed. 465 (1943) (motion for new trial denied); United States v. Apel, N.D. Ill., 44 F.Supp. 592 (1942) (indictment sustained); as well as the *Daulong* and *Marino* cases cited in text.

6. In *Daulong*, the defendant was alleged to have said that he "had a notion to"

kill and "felt like" killing the President. These words were held to be mere expressions of hope or desire that someone might kill the President, rather than "an expression of determination or intent to do the act itself." There was dictum to the effect that the statute required apparent but not actual intent to carry out the threat.

In *Marino*, the defendant was alleged to have posted a statement reading "There can be slain no sacrifice to God more acceptable than an unjust President." Here too the court found in the words no expression of apparent intent, hence no threat.

the claim that a supposed threat was made as a joke was held to be no defense in *Pierce*, "[t]he claim of exaggeration is entitled to the same treatment."

The trial judge here relied on *Ragansky*, *Pierce* and *Rothering* in charging the jury as follows:

"You are told that if one makes a threat against the President, he cannot shield himself by a claim that the words were uttered lightly or without intent to do bodily harm. It is the making of the threat, not the intent to carry it out, that violates the law. Therefore, idle talk or jesting is not a defense. * * *"

Appellant had established at trial that the audience had laughed when he made his statement. He urged to the jury that, given the circumstances, the offending words were at most rhetorical exaggeration or hyperbole, which the jury could not believe beyond a reasonable doubt were accompanied by an intent to harm the President.

I have indulged in a perhaps overlong recitation of the facts of cases in which Section 871 convictions were sustained under the *Ragansky* construction simply in order to demonstrate that Congressman Webb knew what he was doing when he insisted that "willfully threaten" meant "threaten with intent to execute" in his bill. He did not think "we ought to be too anxious to convict a man who does a thing thoughtlessly." Where the standard he convinced the House to maintain has been ignored, men have been convicted of doing something

thoughtless—of using offensive language, with some implication against the President's life, which was meant as jest, as rhetoric, or as hyperbole.

## II

I do not rest my belief that this conviction cannot stand upon the legislative history of Section 871 alone. The First Amendment restricts the construction which may constitutionally be placed on the statute, at least in cases of the kind which is before us today.

In my view, Section 871 is on its face a valid statute, designed to ward off two evils which Congress has the constitutional power to prevent. The first evil is an attempt on the life of the President. The second is restriction of the President's movements, and hence interference with his conduct of his duties, caused by reasonable fear for his safety arising out of serious threats on his life.[7] That Congress legitimately aimed at these evils in enacting what is now Section 871 is indicated by the legislative history.[8]

However, the statute which Congress passed in the relatively calm peacetime spring of 1917 was destined to be first construed in a nation at war when concern for constitutionally protected individual rights is ordinarily at low ebb.[9] Thus in United States v. Stickrath, *supra*, the first case construing the act, the court interpreted it on the understanding that the use of threatening language against the President "stimulates opposition to national policies, however wise," "is an affront to all loyal

7. A threat may endanger the President's life either by indicating that the person making the threat plans to attempt assassination, or by inciting others to the crime. If the former were the legislative concern, the statute would come dangerously close to punishment for thoughts alone. Where the latter is feared, the statute should be construed consistently with other laws making incitement to crime an offense.

The purpose of protecting the President's freedom of movement appears to subsume the purpose of protecting his

safety. Any threat serious enough to warrant punishment for endangering life would presumably also serve to restrict official mobility.

8. *See* Notes 2 and 3, *supra*.

9. For an account of the widespread judicial abdication of responsibility for civil liberties during World War I, *see generally* Z. CHAFEE, FREE SPEECH IN THE UNITED STATES 36–107 (2d ed. 1941), and for a criticism of wartime prosecutions under this statute, *see id.* at 184.

and right-thinking persons," and "is akin to treason,"[10] 242 F. at 153.

The trial court in United States v. Stobo, *supra*, held that "[t]he vital inquiry under the act is whether the threat is of such a nature as to create or tend to create sedition or disloyalty." 251 F. at 692. And in United States v. Jasick, E.D.Mich., 252 F. 931, 933 (1918), we find that threats against the President indicate "a spirit of disloyalty" and arouse "resentment and concern on the part of patriotic citizens."

All of these stated reasons for interpreting Section 871 broadly cannot stand First Amendment scrutiny. Speech may not be prohibited in this country because it stimulates opposition to national policies, indicates or produces a spirit of disloyalty or affronts right thinking people. This was made finally clear by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which laid to rest the threadbare contention that the First Amendment preserved the English common law of seditious libel.

Nor does the First Amendment give Congress a free hand in pursuing its valid objectives of protecting the President's safety and his freedom of movement. Particular "threats" within the ambit of Section 871 may be protected speech, and courts may be required to decide whether such threats may be prohibited under the clear and present danger test. Of course, all spoken threats do not constitute protected speech. Utterances which "are no essential part of any exposition of ideas" or which are "not in any proper sense communication of information or opinion" are not within the purview of the First Amendment.

Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Cantwell v. State of Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Thus threats are properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues.

On the other hand, where an utterance does convey an idea, particularly an idea about how public affairs should be conducted, the label "threat" does not preclude First Amendment protection any more than do the labels "obscenity," Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), or "libel," New York Times Co. v. Sullivan, *supra*.

Nor is provocative, tasteless, or even shocking speech outside the constitutional protection. The First Amendment favors "uninhibited, robust, and wide-open" debate on public issues, debate which may include "unpleasantly sharp" attacks on public officials. New York Times Co. v. Sullivan, *supra*, 376 U.S. at 270, 84 S.Ct. 710. Free speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).

For these reasons, speech which communicates ideas, particularly speech which criticizes public policies or public officials, "is * * * protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Ibid.*[11]

---

10. The suggestion that threatening the President is "akin to treason" is historically accurate. According to English law, it had been treason to "compass or imagine" the death of the King at least since the statute of 25 Edw. 3 in 1352, and still was at the time the Constitution was framed. *See generally* 2 J. STEPHEN, HISTORY OF THE CRIMINAL LAW OF ENGLAND 241–297 (1883). For an account of two perhaps apocryphal

extreme applications of this statute, *see* Note, 32 HARV.L.REV. 724 (1919). Chafee suggests that the careful definition of treason in the Constitution, Article III, Section 3, which excludes "imagining" or "compassing," invalidates by implication Section 871. Z. CHAFEE, *supra* Note 9, at 172.

11. I have no doubt that clear and present danger is the proper test to apply to direct restrictions of protected speech.

Prosecutions under Section 871 for alleged threats which are part and parcel of the communication of ideas, particularly political ideas, must thus conform to the clear and present danger test. At the very least, this consideration supports the construction of the statute urged in Part I of this opinion. Where statutes impinge upon protected speech, statutory provisions governing intent will be read to require specific intent. Abrams v. United States, 250 U.S. 616, 627, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (dissenting opinion of Mr. Justice Holmes); cf. Dennis v. United States, 341 U.S. 494, 499–500, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Where the allegation is that the defendant, by his threat, incited others to kill the President, it is clear that specific intent to bring about this result must be shown. Yates v. United States, 354 U.S. 298, 318, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Otherwise protection of free speech would be illusory, for in one sense "[e]very idea is an incitement." Gitlow v. People of State of New York, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (dissenting opinion of Mr. Justice Holmes).[12]

Where the claim is that the alleged threat brings about the other evil which concerned Congress in enacting Section 871, "threats * * * which would tend to coerce * * * or restrain [the President] in the performance of his duties," a more difficult problem arises in reconciling this statutory purpose with the First Amendment. Congress may no doubt legislate to meet this evil. The restrictions placed upon the movements of the President, as well as other public men, by the danger of assassination have recently been much noted and deplored.

There can be little doubt that the proper functioning of the Executive branch is hindered by these restrictions. On the other hand, a First Amendment standard which would allow abridgement of speech because it "tends" to create a substantive evil has been long rejected in favor of the clear and present danger test. Abrams v. United States, supra, 250 U.S. at 627–628, 40 S.Ct. 17 (dissenting opinion of Mr. Justice Holmes); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 633, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).[13]

Many statements wholly protected against restriction by the First Amendment may "tend" to contribute to the climate of hate which makes the free movement of the President dangerous. The affirmations of the affluent as well as the militant exhortations of the dispossessed may have this tendency. Many statements on political affairs may, by implication or through hyperbole, compass the violent end of the Chief Executive. The threat of punishment for all such statements would exert a chilling effect on political speech too drastic to be consistent with the guarantee of free expression.

I would reconcile these competing considerations as follows. Where an alleged threat which involves the communication of ideas is thought to "coerce or restrain" the President in the performance of his duties, a conviction under Section 871 can be sustained if (1) the defendant made the alleged threat with specific intent to execute it, and (2) in the context and circumstances the statement unambiguously constituted a threat upon the life or safety of the President. The

---

Though criticized by both balancers and absolutists, and occasionally weakened by the courts under the stress of extraordinary times and circumstances, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), the historic standard has survived. Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 9 L.Ed. 2d 697 (1963); cf. Kingsley International Pictures Corp. v. Regents, 360 U.S.

684, 689, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959).

12. In any event, there would appear to be no support for any claim of an inciting threat in this case.

13. And see Dennis v. United States, supra Note 11, 341 U.S. at 507, 71 S.Ct. 857, for explicit recognition that the early Holmes and Brandeis dissents in First Amendment cases have become law.

first requirement follows from both the legislative history and the consistent strict requirement of specific intent in criminal prosecutions impinging upon protected speech, Yates v. United States, *supra*, 354 U.S. at 318, 77 S.Ct. 1064. The second is an application of the clear and present danger test to the purposes of Section 871.

Consonant with Dennis v. United States, *supra*, 341 U.S. at 511–515, 71 S.Ct. 857, I would leave the question of subjective intent to the jury, but would make the application of the objective standard a question for the court. In *Dennis*, the Court ruled that "[t]he doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial rule to be applied as a matter of law by the courts." *Id.* at 513, 71 S.Ct. at 869. In free speech cases, appellate courts have long engaged in detailed examination of the facts to determine whether the First Amendment permitted restriction of expression in the particular situation.[14]

### III

When the standards developed in Part I of this opinion are applied to the facts of this case, it is clear that at the very least appellant should have a new trial. The District Court followed the *Ragansky, Pierce* and *Rothering* cases in charging the jury that intent to execute the supposed threat was not an element of the offense. This was contrary to the meaning of Section 871 as Congress enacted it. Further, the First Amendment standards developed in Part II of this opinion, in my judgment, require reversal and entry of a judgment of acquittal.

In applying these standards, the first question is whether appellant's supposed threat was speech of a kind which comes within the protection of the First Amendment at all, or whether it was, like obscenity, malicious libel and the threats which typically constitute the crimes of extortion and assault, excluded from such protection. The inquiry here is whether the words used were "in any proper sense communication of information or opinion." Cantwell v. State of Connecticut, *supra*, 310 U.S. at 310, 60 S.Ct. 900, 84 L.Ed. 1213.

The version of appellant's statement most damaging to him, that reported by Agent Freeburger, was in my mind unquestionably the expression of a political idea. The idea was that it was wrong for Negroes to kill their "black brothers," the Vietnamese, because their real grievance was against the white establishment at home, personified by the President. The idea is the same as that articulated in more developed and refined form in the statement held protected by the First Amendment in Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

The fact that the statement expressed political ideas merely brings the First Amendment into play; it does not decide the case. The statement "I have a gun and I intend to kill the President, because that's the best way to end the war in Vietnam" similarly expresses an idea, but it might well be the basis of a valid conviction under Section 871. The language used and the surrounding circumstances must be examined to determine if appellant's words constituted an unambiguous threat against the President's life.

Several factors lead me to conclude that they did not. First the "threat" was uttered in conjunction with an attack on the war and the killing of "black brothers." In this context, the words Agent Freeburger reported are more likely than not to have had as their natural purport the meaning ascribed to them by the witness Wieghart—the rhetorical idea that appellant would *rather* shoot the President than the Vietnamese.

---

14. On the allocation of issues between judge and jury in First Amendment cases, *see* E. HUDON, FREEDOM OF SPEECH AND PRESS IN AMERICA 116– 121 (1963); Richardson, *Freedom of Expression and the Function of Courts*, 65 HARV.L.REV. 1, 24–31 (1951).

Second, appellant's "threat" was conditioned on an event which he stated he had no intention of allowing to take place —his induction into the armed forces. The premising of a "threat" upon a condition which the speaker has the power and avowed intention to frustrate renders it something less than an unambiguously serious threat.

Finally, the audience's response—laughter mixed with applause—is relevant if not dispositive. Such laughter may, as the majority opinion argues, have sinister implications. However, it is much more reasonable to interpret it as indicating that the words which evoked it were taken in context by their hearers to be hyperbolic emphasis of a political view which they supported.[15]

In short, appellant's words, taken in their context, are most readily susceptible to the interpretation that they were a crude, even offensive, rhetorical device. They cannot be read unambiguously as a serious threat against the President. Thus in my view punishment of appellant for speaking these words would deprive him of the right to free speech guaranteed to him by the First Amendment.

I respectfully dissent.

15. These three factors, of course, also go to the statutory question of whether defendant made a threat against the President in the sense of an expression of *apparent* intent to harm him. *See* United States v. Marino, N.D.Ill., 148 F.Supp. 75 (1957); United States v. Daulong, W.D.La., 60 F.Supp. 235 (1945). As such they were doubtless considered by the jury. However, since in my view the clear and present danger test requires a *judicial* determination that an unambiguous threat has been made, the jury's apparent findings cannot have controlling weight here.