**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph Michael COMPTON, Defendant-**
**Appellant.**

**No. 754, Docket 33842.**

United States Court of Appeals,
Second Circuit.

Argued May 5, 1970.

Decided June 18, 1970.

Ross Sandler, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, and John W. Nields, Jr., Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Phylis Skloot Bamberger, New York City (Milton Adler, The Legal Aid Society, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, WATERMAN, Circuit Judge, and JAMESON, District Judge.*

JAMESON, District Judge:

This is an appeal from a conviction for threatening the life of the President in violation of 18 U.S.C. § 871.[1] Appellant was given a three-year suspended sentence and placed on probation. Subsequently probation was revoked. Following a psychiatric study appellant was sentenced to serve the full three year term.[2]

About 7:10 P.M. on April 14, 1969, appellant called the New York Police Department emergency number and said he was calling "about the assassination of President Nixon." In response to questions he stated that the assassination would take place at Fifth Avenue and 61st Street toward the end of April or beginning of May, and that he was going to do it himself. Asked why he intended to assassinate the President, appellant replied, "Because I can't stand him." He said that "God told" him to carry out the mission and that he intended to use a ".38 automatic Smith & Western, Service Revolver," which he had "hidden un-

til the assassination." In this conversation he refused to give his name, but said that he had been living in Greenwich Village at Bleecker and Thompson.

A few minutes later appellant called again. He gave his name and stated that he was calling from a public phone booth in the Greenwich Hotel, where he had registered that day. In response to questions he gave information regarding his personal and family background. He said that he could not find the gun in the "secret hiding place" where "God had told" him to hide it. In response to further questions he said that he was going to kill the President with a "knife or a gun or a shotgun," because he didn't like the President or the Republicans; that the President was "destroying the nation" and him, and that "God told me to kill him."

In response to the police officer's suggestion that appellant come to the police station, appellant said that he couldn't walk; that he had been "taking pills" and had been drinking. He agreed to meet the officer in front of the Greenwich Hotel and gave a description of his physical appearance and apparel.[3]

About 7:30 P.M. appellant was taken into custody and handcuffed in front of the Greenwich Hotel. A police officer testified that appellant talked a lot, was able to walk unaided, and that his speech was clear. Appellant asked why he was handcuffed, and the officer told him that it was to keep him from hurting himself "or somebody else." To this appellant responded: "Don't get mad at me, I don't

---

\* Sitting by designation.

1. 18 U.S.C. § 871(a) reads in pertinent part: "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, * * * or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States * * * or knowingly and willfully otherwise makes any such threat against the President, * * * shall be

fined not more than $1,000 or imprisoned not more than five years, or both."

2. On January 9, 1970, appellant admitted a violation of probation. On January 14, 1970, he was committed for a study pursuant to 18 U.S.C. § 4208(b) and (c), and on April 21, 1970, committed for the three year term.

3. Appellant's calls, like all calls to the emergency number, were recorded directly from the telephone lines on special equipment. Typewritten transcripts of the two calls were received in evidence as exhibits.

intend to hurt you guys, I just want to kill President Nixon." [4]

In addition to the tape recordings of the telephone conversations and the testimony of the officer concerning the conversation when appellant was taken into custody, the Government introduced evidence of an incident which occurred during the night following election day, November 5, 1968. A Secret Service agent testified that about 4:30 A.M. on November 6, appellant was found by special agents of the United States Secret Service on the 34th floor of the Waldorf-Astoria Hotel, one floor below a suite occupied by President-elect Nixon. In a conversation with the agent, appellant said that Nixon "would never become President." According to the agent, appellant was intoxicated and was talking very loudly. He was removed by the special agents to the Waldorf garage, where he threatened to kill Mr. Nixon.

Appellant was taken into custody by the Secret Service agents and taken to Bellevue Hospital. Prosecution for this incident was declined "due to the fact that Compton was intoxicated at the time he made the threatening statement against President Elect Nixon, and also because he is now at Bellevue Hospital

for an indefinite period undergoing psychiatric observation." [5]

Testifying in his own behalf, appellant admitted that he was in the Waldorf-Astoria Hotel in the early morning hours of November 6, 1968. He testified that he went from party to party in the hotel, drinking, and that he was apprehended as he alighted from an elevator on the 34th floor, intending to stop at a party he had heard was being given by one of Mr. Nixon's daughters. He denied that he threatened the life of President-elect Nixon and said that he meant Mr. Nixon would not be President because Mr. Humphrey was going to win the election.

Appellant testified further that prior to April 14, 1969, he had been undergoing treatment for alcoholism at Central Islip State Hospital. He was released that day and after his release begain drinking. By evening he decided he needed help for his alcoholism. He admitted making the two calls recorded on the tapes. He claimed that he was drunk when he made the calls and that the only reason he spoke of killing the President and of receiving instructions from God was to appear psychotic and gain readmittance to the hospital. The defense of insanity was not raised.[6]

4. In response to further questions appellant told the officers that he had a gun, which he had hidden behind a garbage can, and that he had bought the gun "on the Bowery" and in payment had used money he had gotten from the Welfare Department that morning.

5. Excerpt from letter dated December 5, 1968, from Special Agent of the United States Secret Service to the United States Attorney for the Southern District of New York, confirming an interview on December 3, 1968, between a member of the staff of the United States Attorney and a special agent of the Secret Service.

6. Prior to trial, the court ordered a psychiatric examination to determine appellant's ability to stand trial. A report of the psychiatrist dated May 7, 1969, concluded: "If he has access to alcohol, Mr. Compton becomes inebriated and behaves in a confused fashion. He is not psychotic now and is able to participate

effectively with his attorney for his defense."

In a supplemental report dated June 4, 1969, the psychiatrist stated that he had listened to the tape recordings of the telephone conversations of April 14, 1969, and that, "The tone of the communication and his halting speech indicated that he was under alcoholic influence, although not drunk. He knew what he was doing and he was motivated by his desire to be readmitted to the hospital for medical treatment for his alcoholic habit." The report concluded: "As far as his offense goes, I wish to state that at the time he made the threat and telephone calls, Joseph Michael Compton was under the toxic effect of alcohol, but not to such degree that he would not be conscious of his act and its consequences. He remembers well and motivates his actions. He was not in a state of drunkenness which is associated with confusion and amnesia."

Appellant contends that (1) his speech was protected by the First Amendment and the district court erred in refusing to charge the jury that the Government must prove intent to carry out the threat; (2) the Government failed to carry its burden in showing that the threat was uttered with apparent determination to carry it out; (3) the statute required proof of intent to carry out the threatened words; and (4) the court erred in admitting the statement made by appellant when he was in custody.

The first three grounds of error are related and present the question of whether under 18 U.S.C. § 871 it is sufficient for the Government to establish an intent to make a true threat, as appellee contends, or necessary to establish also an intent to carry out the threat, as appellant contends. This question has been determined adversely to appellant's contention in two cases, Watts v. United States, 131 U.S.App.D.C. 125, 402 F.2d 676 (1968), rev. 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) [7] and Roy v. United States, 416 F.2d 874 (9th Cir. 1969).

In Roy v. United States, *supra*,[8] decided subsequent to the reversal in Watts, the Court of Appeals for the Ninth Circuit adopted the reasoning of the majority opinion of the Circuit court in *Watts* and concluded:

"Thus, it appears that the statute was designed in part to prevent an evil other than assaults upon the President or incitement to assault the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life. * * *

"This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat." 416 F.2d at 877, 878.

We agree with the District of Columbia [9] and Ninth Circuits and hold that it was not necessary to establish an intention to carry out the threat.

7. In a per curiam opinion the Supreme Court recognized that the statute "is constitutional on its face" but reversed on the ground that the statement in that case was "political hyperbole" and not a "true 'threat.'" The Court did not determine the question here presented but did cast doubt on the position of the majority opinion in the Court of Appeals, saying: "The judges in the Court of Appeals differed over whether or not the 'willfulness' requirement of the statute implied that a defendant must have intended to carry out his 'threat.' Some early cases found the willfulness requirement met if the speaker voluntarily uttered the charged words with 'an *apparent* determination to carry them into execution.' (citation omitted) The majority below seemed to agree. Perhaps this interpretation is correct, although we have grave doubts about it. See the dissenting opinion below, 131 U.S.App.D.C. at 135–142, 402 F.2d at 686–693 (Wright, J.)." 394 U.S. at 707–708, 89 S.Ct. at 877–878 (emphasis in original). One justice would have denied certiorari; another dissented; and two others dissented on the ground that the case should not have been decided on the merits without a hearing.

8. Roy was a marine who, prior to shipment to Viet Nam, called a telephone operator and informed her that the President would be killed if he came to the military base. The President of the United States was to visit the base the next day. Roy defended in part by alleging that the statement was a joke. The Ninth Circuit held that no error occurred in "finding that Roy knowingly and willfully threatened the life of the President." 416 F.2d at 878.

9. See also Alexander v. United States, 418 F.2d 1203 (D.C.Cir.1969).

■ The district court properly instructed the jury that the Government must establish "beyond a reasonable doubt that the defendant made a true threat to take the life or to inflict bodily harm upon the President of the United States." The jury was cautioned that "mere political hyperbole or discussion does not constitute a threat"; that if statements made by a defendant "were no more than a crude, offensive method of stating political opposition to the President" the jury would be justified in finding that no threat was made; and that words uttered by the defendant "to the effect that he disliked the Republicans or that the Republicans were wrecking the country and similar such phrases, do constitute mere political hyperbole as a matter of law and cannot in themselves constitute a ground for convicting a person under this statute."

The jury was instructed further that if it found that a true threat was made, it must further find that the threat was made "knowingly and wilfully," and that "the government must establish beyond a reasonable doubt that the defendant comprehended the words he uttered, that he voluntarily and intentionally uttered them with the apparent determination to carry them into execution." On the precise question presented on this appeal, the charge reads: "Although for a finding of guilt it is not necessary for you to find that the defendant actually intended to carry out the threat, it is necessary for you to find that he intended to make the threat and actually made the threat knowingly and wilfully and that the threat was a true threat." [10]

■ We find no error in the instructions. On the contrary, the charge was fair and adequate.[11] Under the evidence the jury could properly find that the statements made by appellant would be interpreted by reasonable men "as a serious expression of an intention to inflict bodily harm upon or to take the life of the President" and that the statements were not "the result of mistake, duress or coercion." Roy v. United States, 416 F.2d at 877, 878.

■ Finally appellant contends that the court erred in permitting the police officer to relate the statement made by appellant when he was taken ino custody, in the absence of the cautionary warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965). Appellant's initial statement that, "I don't intend to hurt you guys, I just want to kill President Nixon" was a spontaneous utterance and not the result of police interrogation. It was "given freely and voluntarily without any compelling influence" and was admissible under *Miranda*. 384 U.S. at 478, 86 S.Ct. at 1630. The answers to subsequent questions, even if improperly received, were so insignificant, repetitious and cumulative that the error, if any, was harmless. Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Affirmed.

10. On this point the court instructed the jury further: "It is for you to determine whether, when on April 14, 1969, the defendant said what he said, he intended a threat, that is, he intended the words as a threat against the President, as the government contends, or whether, as he contends, he merely said these words so the police would pay attention to him and see that he was brought to the hospital and given the treatment he thought he needed. The defendant contends that al- though he was discharged from Central Islip that very morning he realized, after drinking all day, he needed further hospitalization."

11. In response to questions from various jurors the court reread portions of the charge and reiterated and clarified the instructions relating to the meaning of a true threat and the intent required. The tape recordings were also replayed.