IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 15, 2022

**STATE OF TENNESSEE v. QUENTIN DEAN BIRD**

**Appeal from the Circuit Court for Montgomery County**
**No. CC2017-CR-1399   Jill Bartee Ayers, Judge**

_____

**No. M2021-00372-CCA-R3-CD**

_____

The Defendant, Quentin Dean Bird, was convicted by a Montgomery County Circuit Court jury of two counts of first degree premeditated murder. *See* T.C.A. § 39-13-202(a)(1) (2014) (subsequently amended). The jury imposed sentences of life without the possibility of parole, which the trial court ordered to be served consecutively to each other. On appeal, the Defendant contends that (1) he was deprived of his right to equal protection under the law when the State exercised a peremptory challenge against a black prospective juror without articulating a valid race-neutral reason, (2) the trial court erred in admitting graphic autopsy photographs, (3) the sentence of life without parole for the murder of one of the victims was excessive and constituted double jeopardy because the facts used to establish the enhancement factor were also used to enhance the sentence for the murder of the second victim, and (4) the trial court erred in imposing consecutive sentences based upon its finding that the Defendant was a dangerous offender. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

H. Reid Poland III, Clarksville, Tennessee; and James Phillips, Oak Grove, Kentucky, for the Appellant, Quentin Dean Bird.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Robert Nash, District Attorney General; and Arthur F. Beiber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions result from the April 18, 2017 homicides of his former girlfriend, Allison Tenbarge, and their unborn child, Parker Tenbarge. For clarity, we will refer to Ms. Tenbarge as "the victim" and to the child as "the fetal victim." The victim was stabbed about fifteen times and died from her injuries, and the fetal victim died *in utero* of hypoxia, which was related to the stabbing. The Defendant did not challenge the State's proof that he committed the killings, but he contested the evidence of premeditation, contending that the offenses had been either second degree murder or voluntary manslaughter.

The evidence offered at the trial showed that the twenty-year-old victim had been in a romantic relationship with the Defendant for about one year and that at the time of her death, she was pregnant with their child. The victim and the Defendant had lived together in the Defendant's parents' home in Kentucky. The relationship had been off-and-on, but the couple eventually moved into an apartment in Clarksville after the victim's mother provided money for living expenses. About a week before her death, the victim decided to leave the Defendant and to move home with her parents in Indiana. Three days before her death, the victim attended a baby shower in her honor, at which she was photographed with a male guest. The victim posted this and other photographs from the shower on Facebook. The victim's friends and family recalled the victim as a loving, nonviolent person and described her as tall and thin.

On April 18, 2017, the victim and her friend, Regene Gill, drove to Clarksville to retrieve the victim's belongings from the apartment the victim had shared with the Defendant. The victim was expected to return to her parents' home in Indiana by 5:00 p.m. the same day but did not. After the victim's mother called the Clarksville Police, an officer went to the apartment about 10:00 p.m. He found the apartment locked and Ms. Gill in a van outside the apartment. A few hours later, a member of the victim's family provided a key to the apartment. Officers entered, where they found a blood trail on the floor and wall leading up a stairwell. The victim, who had no pulse, lay on the floor in the corner of an upstairs bedroom. She appeared to have several stab wounds, and the walls and ceiling had blood "castoff." The apartment had no signs of forced entry. Stains which appeared to be blood were observed in several rooms, with a large amount of blood being in the room where the victim was found. Using leucocrystal violet analysis, latent blood footprints were found in the kitchen. Knives missing from a knife block in the kitchen were never located at the scene.

Within a couple of weeks before the crimes, the Defendant commented to a coworker that he "regretted [the victim's] being pregnant." The Defendant told a second coworker that the victim had ended the relationship and had moved out of their apartment and that she had been coming back to Clarksville to retrieve her belongings. On the day

of the crimes, the Defendant received a telephone call and told the second coworker that the victim was at the Defendant and the victim's apartment and that she needed a key in order to retrieve her belongings. The second coworker said the Defendant left work and did not return later on the day of the stabbings, even after the second coworker overheard a manager telephoning the Defendant.

While they drove to Clarksville on the morning of April 18, 2017, the victim directed Regene Gill to send text messages to the Defendant from the victim's cell phone. In the messages, Ms. Gill asked when the Defendant would be at work, and the Defendant responded that he was not working that day. When Ms. Gill and the victim arrived at the apartment, the victim used a key to open the door. As Ms. Gill and the victim gathered the victim's and the fetal victim's belongings from the apartment, the Defendant arrived. He "grabbed" the victim and told her she did not have to leave, and he accused the victim of being unfaithful to him and claimed he was not the father of the fetal victim. The Defendant later helped Ms. Gill and the victim pack and remove belongings, and the victim asked Ms. Gill to wait outside in order for the victim and the Defendant to speak privately. Ms. Gill went outside and sat in the van in which she and the victim had arrived. At the victim's request, Ms. Gill held the victim's cell phone when Ms. Gill went to wait in the van. Ms. Gill saw the Defendant come out of the apartment with a television, placed it in the van, and returned inside. During the approximate twenty minutes she waited in the van, Ms. Gill received text messages on the victim's cell phone sent from the Defendant's cell phone asking for more time, how much gas and change were in the car, and for Ms. Gill to leave to purchase chewing gum for the Defendant. The Defendant called the victim's cell phone twice and spoke to Ms. Gill, who heard the Defendant ask another person "if she was going to cancel the doctor's appointment." Ms. Gill did not hear a response from the other person. In the other cell phone call, the Defendant asked Ms. Gill to leave to get chewing gum. Ms. Gill purchased the chewing gum at 11:27 a.m. and returned to the apartment complex, and she noticed that the Defendant's car was gone and that the apartment door was locked. Ms. Gill received a text message on the victim's cell phone stating that the victim and the Defendant had gone to a bank. Ms. Gill believed at the time that the victim sent the text message. Ms. Gill received other text messages on the victim's cell phone about other places the Defendant and the victim purportedly went. She received a text message requesting "[m]essages or . . . screenshots to make [the Defendant] mad for what he did to her." Ms. Gill remained at the apartment until after the police arrived around sometime after 11:00 p.m.

After the crimes, damage was discovered at the victim's family's Kentucky lake house. A window screen was removed, a window was broken, and blood was found throughout the house and outside. A large kitchen knife, a smaller knife, and razor blades were in a bedroom. The knives appeared to have come from a knife block in the lake house kitchen. The bedspread was covered in blood. A bloody sweatshirt was on the floor of another bedroom.

After "pinging" his cell phone, the authorities located the Defendant, who was inside a camper at a recreational vehicle park in Kentucky. A window of the camper had been broken, and the contents of the camper were in disarray. The Defendant came out of the camper voluntarily when the police arrived. He was shirtless and covered in blood, with cuts or puncture wounds on one or both arms. The Defendant was calm. The Defendant's car was parked near the camper, and the passenger seat contained a grill cover, charcoal, and burn marks.

The Defendant was transported for medical treatment and "began to tell [a police officer] . . . the story of what had happened." The Defendant agreed to provide buccal swabs. At the hospital, the Defendant was "laid back and nonchalant about the whole thing."

A forensic cell phone expert examined the victim's and the Defendant's cell phones. Some messages had been deleted from the Defendant's cell phone but none appeared to have been deleted from the victim's cell phone.

Text messages from the two cell phones show that the victim arrived at the apartment around 8:48 a.m. The Defendant asked who was with the victim. A call was placed from the Defendant's cell phone to the victim's cell phone at 9:03 a.m. but was unanswered. At 10:18 a.m., the Defendant's cell phone sent a text message to the victim's cell phone which stated, "Hold on two more minute[s]." At 10:45 a.m., the Defendant's cell phone was used to state, "Okay we're almost done trying to figure out what to do after Parker is born[.]" Two minutes later, the Defendant's cell phone was used to search the internet for information about committing suicide. Throughout the afternoon and evening, the Defendant's cell phone was used to search for suicide methods. Shortly after the first search for suicide information on the Defendant's cell phone, the victim's cell phone received a message from the Defendant's cell phone stating, "And I admitted to him about the other guys." A response asked, "What other guys?" A message from the Defendant's cell phone responded, "Just the one that came to the baby shower." At 11:18 a.m., the message from the Defendant's cell phone asked, "Can you drive to the gas station for [the Defendant?]" A few minutes later, a message from the Defendant's cell phone stated, "Headed to the ba[n]k then we can leave[.]" Messages from the Defendant's cell phone continued and pertained to the purported trip to the bank, whether the victim should reunite with the Defendant, and when the victim would be able leave with Ms. Gill. Messages throughout the afternoon were sent from the Defendant's cell phone to the victim's cell phone about the Defendant and the victim communicating with other women and other men. Some of the messages referred to "Seth," and a message from the Defendant's cell phone requested a photograph of Seth "[f]rom Facebook." As the day progressed, the messages from the victim's cell phone showed that the victim's family became concerned because the victim had not returned home. Messages from the Defendant's cell phone sent

-4-

to the victim's cell phone instructed the recipient to make excuses to others about the sender's location. Messages from the victim's cell phone stated that the victim's family was concerned. At 11:07 p.m., a message from the victim's cell phone sent to the Defendant's cell phone stated, "The Cops Is Here[.]"

The Defendant's internet browser history for April 16, 2017, which was two days before the crimes, showed his cell phone was used to view the victim's mother's Facebook page, which contained photographs of the victim's baby shower.

The victim's OB/GYN physician testified that on April 18, 2018, the victim was thirty-six weeks pregnant and that a fetus was considered viable at twenty-two to twenty-three weeks, or at a weight of 500 grams.

According to the forensic pathologist who performed the autopsies of the victim and the fetal victim, the victim sustained about fifteen stab wounds. Many of the wounds were to her left torso. She had defensive wounds on her left arm and left leg, which the pathologist said would be consistent with the victim having used her arm and leg to shield her pregnant abdomen. The victim's uterus had stab wounds. The fetal victim had "incised sharp-force injuries." The autopsy of the fetal victim confirmed that the fetus was at least thirty-two weeks old and was viable. In the forensic pathologist's expert opinion, the fetal victim might have survived if delivered or taken by C-section. However, the fetal victim "died due to the fact the mom died rather than due to a direct effect of the incised wounds [to the fetal victim]." The expert estimated that the stab wounds were consistent with a knife blade of two and one-half to four and one-half inches. In the expert's opinion, the victim died from blood loss, and the fetal victim died from hypoxia due to dependency upon the victim for oxygen. The manner of death for both victims was homicide.

DNA kinship analysis showed a greater than 99% likelihood that the Defendant was the biological father of the fetal victim.

The jury found the Defendant guilty of first degree premeditated murder of the victim and first degree premeditated murder of the fetal victim.

The trial proceeded to the sentencing phase, in which the jury considered the possible sentences of life and life without the possibility of parole.

The victim's father testified that his family had been "devastated" by the loss of the victims.

A friend of the Defendant testified that the Defendant's actions in the present case were out of character, that the Defendant had been peaceful in their interactions, and that he thought the Defendant had potential for rehabilitation.

-5-

The Defendant's father testified that the Defendant, who was age twenty-one at the time of the crimes, had been a talented high school football player. The Defendant's father thought the Defendant had rehabilitative potential and said the Defendant had expressed remorse for his actions in the present case.

After receiving the evidence, the jury found that the Defendant should receive sentences of life without parole for each of the two convictions. For the first degree murder of the victim, the jury found the aggravating circumstance: "[T]he murder was committed against a pregnant woman, and the defendant intentionally killed the victim, knowing that she was pregnant[.]" T.C.A. § 39-13-204(i)(16) (2018) (subsequently amended). For the first degree murder of the fetal victim, the jury found the aggravating circumstance: "The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older[.]" *Id.* at (i)(1).

The trial court conducted a sentencing hearing to determine whether the sentences should be served concurrently or consecutively. According to the presentence report, the Defendant had prior convictions in Kentucky for domestic violence and two counts of criminal trespass. He had graduated from high school and had dropped out of college. The Defendant was rated "high for violent" using the Strong-R Risk Assessment Tool. In the victim impact statement, the victim's father stated that he had been emotionally injured by the crimes. He recounted that he and the victim had a shared love of country music, that he told her jokes, that he would not get to dance with her at her wedding, and that he had paid for her funeral expenses with money he had saved for her wedding. He also expressed his sorrow over the loss of his grandson, the fetal victim. In a separate victim impact statement, the victim's mother said that the Defendant had taken the victim's confidence, distanced her from loved ones, had belittled her, and had been unfaithful to her even after she became pregnant with his child. She said that the family had been impacted by the loss of the victims and that the victim would have been a good mother. She said the victim's brothers had feelings of guilt and loss.

In an allocution, the Defendant stated that he was sorry but that he understood an apology was insufficient for the victim's family. He said that he was not a bad person and that he had daily regrets for his actions and thoughts of the victims. He said he missed his parents, nieces, and nephews.

In imposing consecutive service, the trial court found that the Defendant was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" *See id.* § 40-35-115(b)(4) (2019) (subsequently amended). The court noted the Defendant's prior criminal history, the deception and manipulation he used to commit the present offenses, and the "horrific multiple stab wounds" to the victims. The court found that consecutive

sentences were justly deserved in relation to the seriousness of the offenses and for the protection of society. This appeal followed.

# I

## Exercise of Peremptory Challenge

The Defendant contends that the State improperly exercised a peremptory challenge to a prospective juror for a race-based reason, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1985). He argues that the prosecutor's stated reasoning for challenging a black prospective juror – that the prospective juror had a local DUI conviction – was pretextual and insufficient to establish a non-racial motive for striking the juror, who was the only black prospective juror called at this point. The State responds that the trial court did not err in determining that it provided a race-neutral explanation for striking the prospective juror from the panel. We agree with the State.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause prohibits the prosecution from excluding potential jurors based solely upon race. *Batson*, 476 U.S. at 89; *see Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (extending the prohibition against race-based peremptory challenges to those challenges made by a defendant). When a party raises a *Batson* claim, the party must first establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96. A defendant establishes a prima facie case of purposeful discrimination by showing that the State "excluded members of a cognizable racial group from the jury pool." *State v. Echols*, 382 S.W.3d 266, 281-82 (Tenn. 2012); *State v. Ellison*, 841 S.W.2d 824, 826 (Tenn. 1992); *see Powers v. Ohio*, 499 U.S. 400, 416 (1991). Second, the party who exercises the peremptory challenge is allowed the opportunity to rebut the prima facie showing by offering a race-neutral reason for its peremptory challenge. *Batson*, 476 U.S. at 97. Third, a trial court must determine whether the objecting party has established purposeful discrimination. *Id*.

A party's race-neutral explanation that merely consists of a denial of discriminatory motive or an assurance of good faith is insufficient. *See id.* Rather, the race-neutral reason must be "related to the particular case to be tried." *Id.* at 98. However, the explanation itself need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (internal quotation marks and citation omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768. In response to the race-neutral explanation, the trial court must examine and assess the plausibility of the explanation in light of all the evidence. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *see Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996). In this regard, the opponent of the peremptory challenge bears the burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 768. A party may raise a *Batson* claim on behalf of a juror without the party's being part of the improperly

excluded group. *See Powers*, 499 U.S. at 400; *see also Ellison*, 841 S.W.2d at 824. In making its determination,

> The trial [court] must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous.

*Woodson*, 916 S.W.2d at 906; *see State v. Hugueley*, 185 S.W.3d 356, 374 (Tenn. 2006).

In *Miller-El*, the prosecutor challenged two African-American jurors because the prosecutor was concerned about the jurors' beliefs regarding the death penalty. 545 U.S. at 243. However, white panelists who had expressed similar views were not challenged. *Id*. at 244. The United States Supreme Court concluded, "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id*. at 241. The Court noted relative to the first juror,

> [N]onblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a black juror's belief in the possibility of reformation even though he repeatedly stated his approval of the death penalty and testified that he could impose it . . . even when the alternative sentence of life imprisonment would give a defendant (like everyone else in the world) the opportunity to reform.

*Id*. at 245; *see Zakour*, 215 S.W.3d at 770-71 (holding that a *Batson* violation occurred in a civil case when the defendants' reason for challenging an African-American juror was inconsistent with how they questioned other potential jurors and based upon incorrect information).

The record reflects that the following occurred during jury selection: The prospective jurors were questioned about their ability to be objective despite information that some of them knew about the case. They were asked about prior criminal cases in which they or close family members had been involved. Two prospective jurors, one of whom was the prospective juror about which the *Batson* issue was raised, stated that they had been prosecuted locally for driving under the influence (DUI). The prospective juror in question had been prosecuted in 2017, and the other prospective juror had been prosecuted in 2008. The jury selection occurred in February 2020. Another juror stated

his brother had various criminal charges during the eight years before the trial in the present case. Another juror stated that her husband had been prosecuted thirty years ago for driving on a revoked license case in another state. All the prospective jurors were questioned about their relationships with anyone in law enforcement. The prospective juror who was the subject of the *Batson* challenge and the other juror who had been convicted of DUI were questioned individually about how they would determine witness credibility and about their understanding of proof beyond a reasonable doubt. The prospective juror with the 2008 DUI conviction was questioned about whether he would evaluate a police officer's credibility differently than other witnesses, and he said he would not. The prospective jurors were questioned about whether they had been victims of violent crime. After peremptory challenges were submitted by the parties, seven prospective jurors were excused. They included the two prospective jurors convicted of DUI, a prospective juror who had been a crime victim and whose brother had a history of multiple criminal charges, and a prospective juror who had twice been a crime victim. Prospective jurors who had witnessed crimes but who did not state they had been crime victims were not excused.

The defense raised a *Batson* challenge to the State's peremptory challenge of the prospective juror convicted of DUI in 2017, noting that he was the only black prospective juror. The prosecutor responded that he had challenged both jurors with prior DUI convictions. The trial court accepted the prior DUI conviction obtained by local law enforcement as a race-neutral reason for the juror in question to be excused by peremptory challenge.

The Defendant argues that the prospective juror's prior conviction was from 2007 and was over ten years old. The record does not support this factual claim. The transcript reflects that the prospective juror said his conviction was from 2017. The Defendant's trial occurred in February 2020. The Defendant also argues that the State failed to question this prospective juror about his ability to be fair, notwithstanding his having been prosecuted by local authorities, but that the State questioned other prospective jurors about their ability to be fair despite their prior interactions with law enforcement or their family members' previous prosecutions.

The Defendant established a prima facie case of purposeful discrimination by showing the exclusion of a member of a cognizable race group from the jury pool. *See Batson*, 476 U.S. at 96; *Echols*, 382 S.W.3d at 281-82. The State offered a race-neutral explanation for the challenge. *See Batson*, 476 U.S. at 97. The trial court determined that the defense had not established purposeful discrimination. *See id.*

The record reflects that the State made peremptory challenges to both jurors with local DUI convictions, that this was the stated reason for the challenges, and that both were excused. The other prospective jurors who had prior interactions with law enforcement or whose family members had such interactions did not report that they, personally, had been

prosecuted.  Two prospective jurors who had been crime victims were excused, although the record does not reflect which party challenged them.  The prospective juror in question was not specifically asked about any prejudice he might harbor toward local law enforcement due to his DUI conviction, but he was questioned about how he would assess witness credibility and his understanding of proof beyond a reasonable doubt.  Upon review, we conclude that the trial court was not clearly erroneous in its finding that the Defendant failed to show purposeful discrimination.  *See Woodson*, 916 S.W.2d at 906; *Hugueley*, 185 S.W.3d at 374; *see United States v. Forrest*, 402 F.2d 678, 687 (6th Cir. 2005) (holding that a prospective juror's history of criminal charges and demeanor provided a sufficient explanation to rebut prima facie claim of racial discrimination).  The Defendant is not entitled to relief on this basis.

## II

## Admission of Autopsy Photographs

The Defendant contends that the trial court erred in admitting autopsy photographs of the victims.  He argues that their probative value was substantially outweighed by the danger of unfair prejudice.  The State responds that the trial court did not abuse its discretion in admitting the photographs.  We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401, 402.  Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.  Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record."  *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).  A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining."  *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."  *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978).  When determining the admissibility of such evidence, the trial court should consider

their accuracy and clarity, and whether they were taken before the corpse was

moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.* at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The trial court held a pretrial hearing regarding the admissibility of the autopsy photographs, at which the court reviewed the photographs and ruled that some were admissible and that others would be excluded. The Defendant does not contend that any of the photographs the court excluded were erroneously shown to the jury.

The photographs in question depict stab wounds to the victim and the fetal victim. The photographs were taken during the autopsy, after the bodies had been cleaned. Six of the photographs depict the victim's wounds, and two depict the fetal victim's wounds. The photographs were taken at close range and are focused on the victims' stab wounds. The photographs are not repetitive because each photograph depicts a different area of the respective victims' bodies. Also, uninjured parts of the victims' bodies are not depicted. The photographs are, without a doubt, disturbing. However, they are not overly gruesome, given the nature of the victims' deaths. The paramount factual issue in this case was whether the killings were premeditated. The number and size of the wounds, their locations on the victim's body, the victim's apparent efforts to shield herself and the fetal victim from the stabbings, and the depth of the wounds into the victim's body reaching the fetal victim were all probative issues related to the question of whether the killings were premeditated. The Defendant has not shown that the trial court abused its discretion in determining that the autopsy photographs were relevant, probative, and admissible, and that any prejudicial effect did not substantially outweigh their probative value. The Defendant is not entitled to relief on this basis.

### III

### Sentencing

### A. Life Without The Possibility of Parole Sentence for the Killing of the Victim

The Defendant contends that the life without the possibility of parole sentence he received for the victim's killing violates double jeopardy because he was sentenced to life without parole for the killing of the fetal victim based upon the same set of facts. The Defendant argues that the State was permitted to seek two life without parole sentences based upon his killing the pregnant victim, effectively punishing him twice for the same

-11-

conduct. The State responds that double jeopardy does not prohibit two life without parole sentences in this case. We agree with the State.

The Fifth Amendment of United States Constitution and article I, section 10 of the Tennessee Constitution provide that no person should be put "in jeopardy of life or limb" twice for the same offense. U.S. Const. amend. V, Tenn. Const. art. I, § 10. Double jeopardy principles proscribe multiple punishments for the same conduct. *See State v. Watkins*, 362 S.W.3d 530, 541-42 (Tenn. 2012).

> The Double Jeopardy Clause has been interpreted as providing three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense.

*Id.* at 541 (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) *abrogated on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).

The Defendant supports his argument with citations to general principles involving double jeopardy, but he has not provided any authority to support his assertion that double jeopardy prevents separate sentences of life without parole for the killing of a pregnant woman and her viable, unborn child. In the present case, the Defendant was sentenced to life without parole for the first degree murder of the victim based upon the jury's finding, "[T]he murder was committed against a pregnant woman, and the defendant intentionally killed the victim, knowing that she was pregnant[.]" *See* T.C.A. § 39-13-204(i)(16). For the first degree murder of the fetal victim, the Defendant was found guilty based upon the jury's finding, "The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older[.]" *Id.* at (i)(1); *see also id.* § 39-13-214 (a) (2018) ("For the purposes of this part, 'another' and 'another person' include a human embryo or fetus at any stage of gestation in utero, when any such term refers to the victim of any act made criminal by this part."). The Defendant was convicted of two separate homicides, and he received a sentence of life without parole for each of the two killings based upon the alignment of the individual aggravating circumstances with the particular facts of each homicide. The undisputed evidence at the trial established the existence of the aggravating circumstances found by the jury as to each homicide. The Defendant has not shown that double jeopardy barred his life without parole sentence as to the first degree murder of the victim. He is not entitled to relief on this basis.

**B. Consecutive Sentencing**

The Defendant contends that the trial court erred in imposing consecutive sentences on the basis that he is a dangerous offender. The State counters that the court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

An abuse of discretion with a presumption of reasonableness standard applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

In imposing consecutive sentences, the trial court found that the Defendant was a dangerous offender whose behavior indicated little to no regard for human life. *See* T.C.A. § 40-35-115(b)(4). In order to impose consecutive sentences on the basis that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," a trial court must also find that the sentences "are reasonably related to the severity of the offenses" and "are necessary in order to protect the public from further criminal acts" by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996). The record reflects that the court made the appropriate *Wilkerson* findings, noting the Defendant's prior criminal history, the deception and manipulation he used to commit the present offenses, and the extent of the

injuries to the victims. The court found that consecutive sentences were justly deserved in relation to the seriousness of the offenses and to protect society from further criminal conduct by the Defendant.

The Defendant argues that the trial court erred in its reliance on his criminal history because the court incorrectly stated that he had two burglary convictions, rather than two criminal trespass convictions. The record reflects that the Defendant had two third-degree burglary charges in Kentucky and that the conviction offense for both charges was criminal trespass. The offense date for one of the trespass convictions was the day after the offense in the present case. For the other trespass conviction, the offense date was the same as the offense date for a prior domestic violence conviction. At the sentencing hearing, the court inaccurately noted that two of the prior offenses were burglaries. However, this misstatement was of little significance, given the extent of the gruesome and excessive injuries inflicted upon the mother of his child, the killing of his unborn child, and the Defendant's repeated violations of the law resulting in convictions, notwithstanding his relatively young age. The Defendant points to evidence he offered at the sentencing hearing to show that his actions in the present case were out of character and that he is capable of rehabilitation. However, his actions belie the testimony of his friend and his father in this regard. The Defendant was convicted of domestic violence at age eighteen, for which he served jail time and was later placed on probation. At age twenty-one, the Defendant committed the present offenses, again showing his inclination to resort to domestic violence, rather than to live within the bounds of the law, and his lack of rehabilitation from the previous domestic violence conviction.

The trial court did not abuse its discretion in imposing consecutive sentences. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE